15380

GREENE v. BROWN ET AL.

(19 S. E. (2d), 114)

April, 1941.

The Order of Judge Henderson ordered to be reported follows:

J. Eugene Parler, one of the defendants, entered into a contract with Mrs. Lila Huey Brown for the erection of a residence for her in the Town of Barnwell.

Parler agreed to furnish the labor and materials, and he purchased from C. L. Greene, trading as Enterprise Hardware Company, the plaintiff, $1,270.85 of supplies, most of which went into the building.

The construction was begun, and after the building was partially erected, and before it was completed, Parler gave up the work and signed a paper stating that he agreed that the contract had been breached by him, and had terminated, since the house had not been completed in a reasonable time.

To provide for the payment of the labor bills, Mrs. Brown advanced to Parler the sum of $800.00, the proceeds of a mortgage executed by her on the premises to Parler on October 11, 1939, and assigned to the Bank of Barnwell.

Mr. Greene, who sold material to the contractor, failed to give the required notice to the owner or to take the necessary steps to secure a mechanic's lien upon the property.

Parler, because of lack of funds, has failed to pay Mr. Greene for the materials bought from him, and Greene brought this action, claiming that the instrument signed by Parler was extorted from him by Mrs. Brown by means of deception and intimidation, and amounts to a fraud against the rights of Parler and others, including himself, whose rights are subrogated to those of Parler; that Mrs. Brown has secured a residence of the value of $3,150.00 at a cost to her of only about $1,200.00; and that the facts show a constructive trust in the plaintiff's favor for which he is entitled to an equitable lien on the property. The defendant, Arthur Owens, is the holder of a mechanic's lien, duly filed, in the sum of $400.55, and recorded on March 2, 1940.

The defendants, Thomas Crenshaw, James E. Hicks, and Leon Zissett, furnished labor on the building, but they, like Mr. Greene, have no valid mechanic's liens. Their bills aggregate about $143.33.

The nature of constructive trusts is clearly set forth in the case of *Bank of Williston v. Alderman*, 106 S. C., 386, 91 S. E., 296, 297, where it is said:

"By the well-settled doctrines of equity, a constructive trust arises whenever one party has obtained money, which does not equitably belong to him, and which he cannot in good conscience retain or withhold from another, who is beneficially entitled to it; as, for example, when money has been

paid by accident, mistake of fact, or fraud, or has been acquired through a breach of trust, or violation of fiduciary duty, and the like. * * * 'It is not essential for the application of this doctrine that an actual trust or fiduciary relation should exist between the original wrongdoer and the beneficial owner. Whenever one person has wrongfully taken the property of another, and converted it into a new form, or transferred it, the trust arises and follows the property or its proceeds.' [Pom. Eq. Jur., §§ 1047 and 1051.]

" 'Constructive trusts do not arise by agreement or from intention, but by operation of law; and fraud, actual or constructive, is their essential element. Actual fraud is not necessary, but such trust will arise whenever the circumstances under which property was acquired make it inequitable that it should be retained by him who holds the legal title. Constructive trusts have been said to arise through the application of the doctrine of equitable estoppel, or under the broad doctrine that equity regards and treats as done what in good conscience ought to be done. Such trusts are also known as trusts *ex maleficio,* or *ex delicto,* or involuntary trusts, and their forms and varieties are practically without limit, being raised by courts of equity, whenever it becomes necessary to prevent a failure of justice.' " 39 Cyc., 170. See, also, *Knobeloch v. Germania Sav. Bank,* 43 S. C., 233, 21 S. E., 13; *Bank of Williston v. Alderman,* 106 S. C., 386, 91 S. E., 296. See, also, 65 C. J., 454-496, inclusive.

"Fraud, actual or constructive, is an essential element in the creation or existence of a constructive trust, and no such trust arises where there are no circumstances which make it inequitable for one to hold absolute title to property against another." 65 C. J., 455.

It is apparent, then, that a highly important question of fact in this case is, Was Mrs. Brown guilty of fraud, deception or intimidation, in connection with the signing of the paper by Mr. Parler, surrendering his rights under the contract?

"Actual fraud is intentional fraud; it consists in deception, intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed." 26 C. J., 1060.

"Constructive fraud is a breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests.

"Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud. An intent to deceive is an essential element of actual fraud. The presence or absence of such an intent distinguishes actual fraud from constructive fraud." 26 C. J., 1061.

First, let us inquire from the evidence if Mrs. Brown was guilty of actual fraud.

I have given this very careful consideration, and my finding and conclusion is that there was no fraud or intimidation intentionally practiced by Mrs. Brown, or by those acting for her, to induce Parler to surrender the contract.

Before this time, Parler had had no experience as a carpenter or contractor. He was a young man who had taken an engineering course at college and during the whole time he was engaged in work on the house he performed full time duty on a WPA road project on which he was employed.

The actual work was done by men who were not skilled carpenters, under the supervision of Parler's father.

The construction was begun in the last part of September, 1939; but during the month of December very little work was done, and Mrs. Brown became quite dissatisfied.

On December 28, 1939, Mrs. Brown sent to Mr. Parler a registered letter, received by him on January 1, 1940, as follows:

"Barnwell, S. C.,
"Dec. 28, 1939.

"Dear Gene:

"In as much as you seem to have quit the job on my house as contracted I feel I am entitled to get some one else to finish it as I am anxious to move in. I consider the contract broken by you and your rights under the contract terminated. I have already advanced you $800.00 by mortgage which is held by the Bank of Barnwell and in order to protect my interest I intend completing the house as best possible so as to avoid further loss to me. I feel that it is necessary to complete the house at once as serious damage to it will result if left longer in its exposed condition.

"If you have any tools on the place please get them as I do not feel responsible for them and should not care to have anything happen to them.

"Very sincerely,

"LILA HUEY BROWN."

On the afternoon of January 1, 1940, Parler went to the home of Mr. J. U. Watts, Jr., a member of the Barnwell bar, who represented the Bank of Barnwell, and it seems also Mrs. Brown, and entered into a conversation about the construction work. Mr. Parler stated that he was having a lot of trouble with it, and did not see what he was going to do. He stated that it did not look as if he could finish it satisfactorily to Mrs. Brown.

Parler and Watts walked over to the house, and looked it over, and then went to Watt's office. Parler was very much worried about his finances and labor, and said he owed bills and could not get any money; and that he did not know what to do. He and Watts figured up the amount of the bills he had on hand for labor and materials, and Parler said he could not finish the job.

At a later conference on the same afternoon at Mr. Watt's office the matter was thoroughly discussed by Mr. Parler, Mr. Watts, and Mr. Charlie Brown, the husband of Mrs. Lila Huey Brown. Parler said he could not finish the work

and that as far as he was concerned the contract was breached by him. Watts stated to Parler that some one else would have to figure how Mr. Greene would get his money, and that Greene would have to look to Parler who was solely responsible for the money.

Mr Watts told Parler that the Bank of Barnwell did not want a mortgage on a half completed house, and asked if he would put in writing his oral statement that the contract was breached. Parler replied that he did not wish to do so until he conferred with Mr. Greene, and tried to get Greene on the telephone at Williston. Being unable to get Greene on the telephone, he called Mr. J. M. Sprawls, the broker who had negotiated for an FHA loan, and told him exactly what had happened that evening, that he could not finish the house, and that he saw no way in which he could do it unless he could get some help.

Mr. Sprawls then went to Greene's residence and talked with him, and in about a half hour called back and talked with Watts and Parler. While the witnesses differ somewhat as to the details of the conversation it is clear that Mr. Sprawls asked Mr. Watts what would be the situation if the contract were released, as to the people Parler owed for materials and that Mr. Watts told him, "They would have to look to somebody else to get their money—either sue Gene (Parler), but they would have to look to somebody else, other than Mr. and Mrs. Brown."

Mr. Watts told Sprawls to tell Parler what to do, so Sprawls talked with Parler, and among other things in the course of conversation Parler asked him, "Now are you certain it is all right for me to sign it," and Sprawls said, "Well, whatever you think." Parler then hung up the telephone and said, "all right, it is over with, let's sign it." Mr. Watts then typed the statement which was then signed by Parler.

In my opinion, there was a total lack of actual or intentional fraud, and I find that the instrument was voluntarily signed by Parler, and there was no deception, intimi-

dation, or duress practiced upon Mr. Parler by Mrs. Brown, Mr. Charlie Brown, Mr. Watts, or anyone.

The next inquiry is, Do the facts and circumstances of the case show a constructive fraud on the part of Mrs. Brown? In my opinion the evidence does not show a constructive fraud.

The principal contention of the plaintiff is that constructive fraud is shown by the fact that Mrs. Brown has been enriched at the expense of Parler and the plaintiffs, and I have carefully reviewed the testimony relating to this phase of the case.

After Parler gave up the work, Mrs. Brown acting in her own interests, and pursuant to her duty to minimize her damages, went ahead and had the partially finished residence completed as best she could and it is the contention of the plaintiff that she now has a residence worth $3,150.00 at a cost to her of only $1,200.00.

I am convinced from the evidence, however, that the house is not worth anything like $3,150.00 and that Mrs. Brown has paid very much more than $1,200.00 for it.

Let us see, then, how much money Mrs. Brown has actually put into the house. According to her own figures she has paid out the following amounts:

| | |
|---|---:|
| For labor, Bank of Barnwell, mortgage. $ | 840.92 |
| Arthur Owen's bill ................ | 400.55 |
| Materials bought and labor paid to complete building ................. | 723.59 |
| Expenses in connection with completing the building ................... | 250.00 |
| To Mr. Beasley, for labor .......... | 150.00 |
| Folk's bill ........................ | 23.00 |
| | $2,388.06 |

The plaintiff contends that a number of items making up the $723.59 should not be counted on the cost of the residence, as not being covered by the contract of Parler; that

the item of $250.00 should not be allowed at all; and that the interest of $40.92 should be deducted.

In my opinion, the item of $22.00 for the night watchman should be allowed. This was made necessary by the fact that the building was in an incompleted condition.

I think the bill for steel cabinet in the kitchen should be counted. The specifications called for a cabinet, and the testimony shows that steel cabinets are cheaper than wooden ones.

Mrs. Brown used hardwood flooring, instead of pine, as provided in the contract, but it appears from the evidence that the difference would be only $8.00. This $8.00 should be deducted from the bill of Lightsey Brothers.

The entire bill of Lewis's Army Store should be allowed. The contractor was to provide all rough hardware. Besides, this bill also includes three rolls of paper.

The bills of Sumter Electric Company amount to $63.04, while the contract limits this amount to 1% of the contract price or $31.50. The difference of $31.54 should be deducted.

I do not think that the bill of Charlie Brown for $85.00 for 186 feet of sewage should be allowed since the contract does not cover connection with the town's sewer line; and some of the cost of the terra cotta pipe should come off, also amounting to $16.35.

In my opinion, the $250.00 of expenses of Mr. Charlie Brown should be allowed. When Parler gave up the work, Mrs. Brown had to secure the materials needed to finish the building, and to have them conveyed to the premises. In calculating the cost of the house to Mrs. Brown I think that five months' interest, or $23.33 should be allowed. The house was under construction about that length of time. According to the contract Mr. Parler was not entitled to be paid anything until the work was completed. Since the owner actually incurred this expense in order to accommodate the contractor, I think the house cost her just that much more. The difference of $17.59 claimed by Mrs. Brown should be deducted.

These deductions aggregate $158.48, and subtracting this amount from the total claimed by Mrs. Brown, we find that the actual cost of the house to her is $2,229.58.

Turning, now, to a consideration of the value of the house, rather than to attempt to fix the value solely with reference to the original contract, it will be much easier to decide this question by taking the house as it now stands, without taking off any of the above deductions except the $17.59 of interest. That was the situation upon which the witnesses based their estimates of value. This would make the cost of the house, as it stands, $2,370.47 or practically $2,400.00.

Giving careful consideration to all of the testimony, it is my opinion that the house is not worth more than that amount.

The plaintiff lays stress upon the letter of September 20, 1940, of the Federal Housing Administration, as to the exceptions upon the second inspection. The testimony shows that at the time of that inspection, the house was only "roughed in." The evidence of Mr. H. E. Bailey, State Director of the Administration, makes clear the very imperfect construction and workmanship. The Housing Administration required only minimum compliance, from the viewpoint of a lender. In addition to the building, it counted as security the lot, which cost $375.00.

Plaintiff also emphasizes the aggregate amount of labor and materials which went into the building. That would be a matter of importance if the house had been properly built, but it is not by any means a controlling factor when the residence has been so poorly constructed.

I have carefully considered these contentions, along with the testimony as a whole, and it clearly appears that the house has not been built by Mr. Parler in a workmanlike manner, and that serious defects are caused by the condition of the roof, the flooring, the porches, the construction of flues, and chimneys, as well as many other matters, covering several pages in one of the exhibits. The testimony of Mr. Bailey is entitled to great weight. The evidence of J. L.

Beasley, E. F. Woodward, L. A. Cave, Dr. Ralph Brown, and J. U. Watts, Jr., gives the estimates of these witnesses of the value of the residence at the present time.

A. P. Scott, a contractor, stated that it would take about $505.00 to put on a new roof, replace the flooring, fix the chimneys, and in general place the building in the shape contemplated by the contract. The estimate of Mr. Beasley was even higher, running to about $590.00.

Furthermore, it should be noted that there was no confidential relationship existing between Mrs. Brown and Mr. Parler. The contractor voluntarily gave up the work, and the effect of his written instrument is a release of Mrs. Brown from any claim for additional payment. He makes no claim now against Mrs. Brown. He defaulted in this action. He does not claim fraud against himself in any pleading. In fact he said that he was glad to get out of the contract, and stated that he was not to get any more money (typed testimony, page 46).

The plaintiff could have no higher right against Mrs. Brown than Mr. Parler had. When the contractor voluntarily agreed that nothing more was due to him, I cannot see how Mr. Greene can establish a debt by Mrs. Brown to Parler, to which he could be subrogated. For subrogation to apply there must be an obligation. *Breedin v. Smith*, 126 S. C., 346, 120 S. E., 64, 60 Corpus Juris, 711.

Evidently Parler was willing, in consideration of being released from the contract, to renounce any claim to further payment; and we are met by the fact that he himself states that nothing is due him.

Plaintiff cites the cases of *Geddes v. Bowden*, 19 S. C., 1, and *Metz v. Critcher*, 83 S. C., 396, 65 S. E., 394. In my opinion these cases are not applicable here. Neither of them dealt with fraud or constructive trusts. In the *Geddes case* it is apparent that something was still due by the owner to the contractor. In the *Metz case* the contractor did not sign a release, as here.

Aside from the doctrine of constructive trust, and of subrogation, I do not know of any other equitable ground upon which the plaintiff may ask relief. Equity cannot take the money of one person and give it to another, without following one of the recognized methods of equity jurisprudence. While upon first glance, it might seem that since Mr. Greene's materials went into the house, Mrs. Brown should pay for them; yet, upon reflection, it clearly appears that it would be highly unjust to the owner to require her to pay the debt of another, which she had in no way agreed to pay, a debt, not a lien on her property, and when she has already paid the value of the house.

While it is a matter of regret that Mr. Greene must look only to Parler for his money, yet it cannot be overlooked that Mr. Parler was the one with whom he dealt, to whom he sold the goods, and upon whom he relied for payment.

Our law, under the Mechanic's Lien Act, is most favorable to those who supply materials for the construction of buildings. Code, Section 8729.

A materialman, selling supplies to a contractor, may give the required notice to the owner, and may take appropriate steps for perfecting a lien on the property. Here the plaintiff failed to take advantage of these laws, made for his benefit, but was willing to rely solely upon the contractor for payment.

In order to secure funds to complete the residence, and no doubt, to buy furniture, Mrs. Brown executed a mortgage on the lot and building for $3,000.00 to the defendant, T. R. Brown, and it has been assigned to E. C. Huey. Mr. Huey has advanced to Mrs. Brown, on the mortgage, the sum of $1,140.00. At the time the mortgage was executed, Mrs. Brown was advised that the mortgage would not come ahead of legitimate liens against her house, and at the hearing before me it was stated on the record by the attorneys for Mr. Huey and Mrs. Brown that, as between them, the mortgage stood for the $1,140.00, but that it was junior to any lien the plaintiffs may establish in this action.

Clearly, Messrs. Greene, Crenshaw, Hicks and Zissett are entitled to personal judgments against Parler for the amounts of their bills, but they have not asked for such judgments and Parler has defaulted. I think that these parties should be allowed, if they be so advised, to amend their pleadings so as to ask for personal judgments against Parler.

I think that the costs in the case, including the stenographer's original transcript of the testimony, should be borne in equal parts by Mr. Greene and Mrs. Brown. While Mr. Greene may be the losing party (Code, Section 756), yet the mechanic's lien of Owens is being foreclosed against Mrs. Brown's property. It is therefore ordered, adjudged and decreed. that the plaintiffs are not entitled to equitable liens upon the property in question. It is ordered and decreed that the liens upon the property have the following rank:

1. The mortgage of Mrs. Brown to Parler, assigned to the Bank of Barnwell with interest to date. No attorney fees are asked for in the bank's answer.

2. The mechanic's lien of Arthur Owens.

3. The mortgage held by E. C. Huey, in the amount of $1,140.00, and interest to date. No attorney fees are asked in Mr. Huey's answer.

Mr. Owens, in his pleadings, asks that the lot be sold and the proceeds applied to his mechanic's lien, but the Bank of Barnwell and E. C. Huey do not press for foreclosure of their mortgages at this time. They seek protection of their liens in the event a sale of the lot is had.

It is therefore, ordered, that unless Mrs. Brown pays the defendant, Arthur Owens, within thirty days from notice of the filing of this decree, the full amount of his mechanic's lien, the defendant Owens shall have the right to apply to the Court, at the foot of this decree, for an order for the sale of the house and lot in question, and for judgment for any deficiency.

It is further ordered, that either the Bank of Barnwell or E. C. Huey, defendants, shall have the right, if either of them so desires, to apply now or at any time, at the foot of this decree, for an order of sale of the premises.

It is further ordered, that the plaintiff, Mr. Greene, and the defendants, Crenshaw, Hicks and Zissett may, if they or any of them be so advised, amend their pleadings within twenty days after notice of the filing of this order and decree, so as to ask for personal judgments against the defendant Parler, such amended pleadings to be served upon the defendant Parler who shall have twenty days in which to answer or otherwise plead thereto.

It is ordered, that the plaintiff, Mr. Greene, and the defendant, Mrs. Brown, each pay one-half of the costs of this action, as taxed by the Clerk of Court, and including the stenographer's original transcript of the testimony.

*Messrs. Crum & Crum,* of Denmark, for appellant,

*Messrs. Brown & Watts,* of Barnwell, for respondents,

Counsel for appellant, in reply brief,

March 9, 1942.

The opinion of the Court was delivered by MR. CHIEF JUSTICE BONHAM.

This case was heard on Circuit by the Honorable E. H. Henderson, Judge of the Second Circuit. His decree evinces that he gave to its study and preparation meticulous care and serious consideration. His findings of fact and conclu-

sions of law are amply sustained by our study of his decree. It would be a work of supererogation for us to add anything to it.

We concur in his expression of regret that the plaintiff cannot recover in this case, due to his failure to give notice in writing to Mrs. Brown, the owner of the house being built, that he was furnishing materials being used in the construction of the house. His failure to give that notice deprived him of the benefit of the lien provided for in Section 8729 of the Code of South Carolina for 1932. This, however, does not entitle him to recover of Mrs. Brown the value of the articles furnished by him. He must look to the contractor to whom he sold the articles.

Let the decree of Judge Henderson be reported. Exceptions are overruled and the judgment affirmed.

MESSRS. ASSOCIATE JUSTICES BAKER, FISHBURNE and STUKES and CIRCUIT JUDGE WM. H. GRIMBALL, ACTING ASSOCIATE JUSTICE, concur.